IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SYSCO PHILADELPHIA, LLC,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 20-6182 |
| | : | |
| **CLAUDIO SILVA,** | : | |
| *Defendant.* | : | |

## MEMORANDUM

**KENNEY, J.**                                                                                                   **March 11, 2021**

No good deed goes unpunished.

The litigants in this case present one simple question as determinative on the issue of whether a preliminary injunction should issue: whether the "New Plan" compensation scheme conferred upon Defendant Silva an employment "benefit" that amounted to the consideration necessary to enforce the restrictive covenant in the Protective Covenants Agreement. The simple answer is no.

**I.      FACTS[1]**

Defendant Claudio Silva ("Silva") was employed by Plaintiff Sysco Philadelphia, LLC ("Sysco") from June 2015 until October 2020. Prior to joining Sysco, Silva developed relationships with members of the management of a major grocery store chain (the "Major Client"). Silva used these relationships to develop and grow Sysco's business relationship with the Major Client and significantly expanded Sysco's relationship with the Major Client. Sysco

---

[1] There are essentially no disputed facts in this case. Unless otherwise noted, the facts included in this section are taken from the Joint Stipulation for Evidentiary Hearing on the Preliminary Injection. ECF No. 30. The citation "Tr." refers to the February 22, 2021 Evidentiary Hearing Transcript, ECF. No. 32.

1

had done minimal business with the Major Client prior to hiring Silva. While Silva was responsible for other accounts, the Major Client was his largest account. The Major Client was to become, as a result of Silva's efforts, Sysco Philadelphia's largest client.

When Sysco hired Silva, it offered him a salary of approximately $110,000 per year. Sysco changed Silva's pay structure in July 2017 from this salary to an incentive-based pay structure with bonuses and commissions to compensate him for bringing in and growing Sysco's largest client. Under this incentive-based plan (the "Old Plan"), Silva received "regular pay" of $400 per week; that is, $20,800 down from $110,000, the benefit now being driven by the bonus and commission structure. He received a bonus based on the percentage of gross profit calculated on an internal Sysco matrix, a bonus of 1% of Sysco's gross sales to the Major Client, a commission based on gross profits per invoice, a fixed yearly subsidy, and a commission adjustment that fixed errors in his paychecks. Silva's W-2s reflect that his income increased significantly from $110,000, and he earned $146,929.09 for calendar year 2017, $173,222.02 for 2018, and $239,516.67 for 2019.

However, because of the impact of the COVID-19 pandemic on Sysco's business, Sysco changed all sales associates' compensation for the fourth quarter of its 2020 fiscal year,[2] from April-June of 2020. For each week from April 18, 2020 through July 2, 2020, Sysco paid Silva exactly $2,738.87 each week, which was comprised of $400 in "Regular" pay, and $2,338.87 in "Subsidy" pay. He also received additional commission payments in April, May, and June for a minimum of $2,738.87 each month. Sysco calculated Silva's base salary for Q4 2020 to be $142,421 annualized for this three month period, which was far below what he was on track to earn, even considering COVID.

---

[2] Sysco's accounting is on a fiscal year basis with July 1 being the start of the fiscal year.

2

After this three month pay schedule, Sysco then rolled out a new permanent nationwide compensation plan (the "New Plan") for all of its marketing associates, effective June 28, 2020. The stated purpose of the New Plan was to respond to "[t]he unforeseen impact of the COVID-19 crisis on the compensation of our sales force . . . and provide greater stability in income." As part of the New Plan, Sysco changed all marketing associates' job titles from "Marketing Associate" to "Sales Consultant." Silva was given the highest "career level" under the New Plan, meaning that he had the highest level of guaranteed weekly pay compared to other sales associates. Under the New Plan, Silva's annual base salary was $118,684.00, up from $20,800, and his guaranteed weekly pay was $2,282.39. Silva was also offered Sysco stock units worth approximately $17,803, at the time the award was granted. The stock units would vest 1/3 each year over three years.

However, also under the New Plan, Sysco eliminated commissions and subsidies, and Silva's bonus structure changed from the Old Plan. Under the New Plan, Silva had an annual bonus target of approximately $60,000. The target was based 50% of his annual salary. The bonus target was divided monthly, which was approximately $5,000 per month. For Silva to be eligible for the lowest-level bonus, which would be 50% of Silva's monthly bonus target, he would have to increase his sales 10% over the prior month. For Silva to be eligible for 100% of his monthly bonus target, he would have to grow his sales by 15% over the prior month. For Silva to be eligible for 150% of his monthly bonus target, he would need to grow his sales by 20% over the prior month. Silva's bonus was capped at 150% of his monthly bonus target. In other words, Silva was eligible for a bonus up to $89,016.27, depending on his sales performance. There was no cap on Silva's bonus potential under the Old Plan. At the time the New Plan was presented to Silva, Sysco calculated Silva's maximum total compensation or "TC

Max" to be $207,698.00, which was the sum of his maximum bonus potential and base pay, although he could earn what were called Spiffs, which Silva had never earned more than $3,000.

As part of the New Plan, sales consultants were required to agree to a Protective Covenants Agreement (the "PCA"). On Friday, June 12, 2020, Silva had a meeting with his direct supervisors to discuss the New Plan and PCA. Silva was told that he needed to sign and return the PCA by Monday, June 15, 2020 if he wished to continue his employment. If he chose to accept, Silva was required to sign the PCA by Monday June 15, 2020 at 5:00 p.m. The PCA stated he was being placed into a position of trust and confidence and that because of his position, he would be privy to Sysco's Confidential Information. Silva signed and returned the PCA.

In October 2020, Silva resigned from his employment at Sysco and accepted a position at Driscoll Foods, a direct competitor of Sysco. Before leaving Sysco, Silva downloaded onto his personal USB drive and took a total of eighteen documents that contained Sysco's pricing information, usage reports, and product files relating to several customers.

## II. PROCEDURAL HISTORY

On December 8, 2020, Plaintiff filed a Complaint against Silva (ECF No. 1), bringing claims for injunctive relief, breach of contract, violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*, violation of the Pennsylvania Uniform Trade Secrets Act, and conversion. ECF 1 at 12-17. Plaintiff sought an order enjoining Silva from violating the terms of the PCA and other injunctive relief, actual damages, punitive damages, and attorney's fees. *Id.* at 15-16. Along with its Complaint, Plaintiff filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction restraining Defendant Silva from violating the terms of the PCA, using any confidential, proprietary or trade secret information of Sysco, or

communicating with Silva's "Covered Customers," and ordering Silva to return any Sysco documents in his possession. ECF No. 3. The Court, on December 8, granted Plaintiff's Motion for a Temporary Restraining Order, which the parties extended by stipulation, and reserved ruling on the Motion for a Preliminary Injunction. ECF No. 6; ECF No. 8. An evidentiary hearing was held on February 22, 2021, and the Court will now rule on the Plaintiff's Motion for a Preliminary Injunction.

### III.   STANDARD OF REVIEW

Preliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (internal marks omitted). A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits of his claim, (2) that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 517 (E.D. Pa. 2018). "The failure to establish any element...renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). The movant bears the burden of showing that the four factors weigh in favor of granting the injunction. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir.1990).

### IV.   DISCUSSION

The dispositive element before the Court is the likelihood of success on the merits. Because the Court finds that Plaintiff has not met its burden to show that it would be likely to prevail on its claims a trial, and is therefore not entitled to injunctive relief, the Court will not address the other elements. A "likelihood of success on the merits" for the purposes of a

preliminary injunction analysis does not require "a moving party to demonstrate a certainty of prevailing, but rather ... a reasonable probability of eventual success in the litigation." *Ferring Pharm. Inc. v. Watson Pharm.*, No. 12-CV-05824 DMC JAD, 2013 WL 1405226, at *5 (D.N.J. Apr. 4, 2013) (internal quotation omitted).  To prevail, Sysco would have to show that the PCA is enforceable, which it cannot do.

Because the PCA was entered into after Defendant Silva was already employed with Sysco, it will only be enforceable if it is supported by "new and valuable" consideration.  *Ricoh USA, Inc. v. Bailon*, 419 F. Supp. 3d 871, 875 (E.D. Pa. 2019).  Under Pennsylvania law, covenants not to compete in the employment context are disfavored as restraints on trade that prevent former employees from earning a living, so the Court will the assess the adequacy of the consideration.  *Socko v. Mid-Atl. Sys. of CPA, Inc.*, 99 A.3d 928 (Pa. Super. 2014); *see also Keeler v. Taylor*, 53 Pa. 467, 468-69 (1866) ("The general rule is that all restraints of trade, if nothing more appear, are bad.").  Post-employment restrictive covenants are enforceable only if the employee receives some corresponding benefit or favorable change in employment status. *Socko*, 99 A.3d at 933 (citing *Maintenance Specialties, Inc. v. Gottus*, 455 Pa. 327 (1974) (Jones, C.J., concurring)).  New consideration can include (1) the acquisition of stock; (2) special training or knowledge acquired during employment; (3) promotions; and (4) pay raises, employment benefits, or other advantages to the employee. *See In re Verdi*, 244 B.R. 314, 324 (Bankr. E.D. Pa. 2000) (collecting cases).  However, no "new" consideration to support a restrictive covenant exists where the contract recites the salary which the employee is already receiving, the profit-sharing plan offered is available to all employees, or a bonus is provided but not guaranteed.  *Id.*  Consideration will only be found when the employee actually gained something in exchange for his or her promise to abide by the restrictive covenant.

Plaintiff Sysco argues that Silva received far more consideration than is required under Pennsylvania law to support a restrictive covenant.  Sysco observes that Silva's income ranged from $146,929.09 to $239,516.67 annually under the Old Plan and, since his income was largely based on his sales performance, the only "guaranteed" portion of his compensation was his $400 weekly salary.  Under the New Plan, Sysco increased Silva's base salary by over 500%, from $20,800 to $118,684.  Sysco also cites other benefits conferred under the New Plan: eligibility for significant monthly bonuses that were "easier to achieve"; eligibility for special incentive bonus programs (in addition to the monthly bonus payments); stock units worth approximately $17,000 at the time of the grant and that have significantly increased in value since; new automatic monthly transportation stipend (whether or not the sales consultant actually traveled); and a new mobile phone with the monthly calling plan paid for by Sysco.

The Court starts with assessing the Defendant's prior compensation.  Defendant Silva's gross pay for 2017 was $147,000, for 2018, $173,000 and for 2019, $240,000.  While Sysco focuses on Silva's average yearly income, it is clear from the record that Silva's income was on a trajectory.  In conjunction with signing the PCA, the New Plan capped his maximum total compensation at $207,000.  This is a clear pay decrease from his 2019 income and from his projected 2020 income.[3]  To make up for this clear pay cut, Plaintiff cites that the Defendant would be eligible for "Spiffs" (not an acronym, it is a term of endearment within Sysco) under

---

[3] While what Silva would have earned at Sysco had he not resigned and had Sysco not changed the compensation scheme cannot be known with certainty, the undisputed evidence in the record suggests that Silva was on track to earn approximately $300,000 in 2020.  Silva earned over $75,000.00 in the first three months of calendar year 2020.  Sysco's gross sales to the Major Client – a large component of Silva's compensation – actually increased in 2020 due to COVID, so Silva's incentive pay would have likely have increased as well.  Tr. at 86:14-15.  Sysco has presented no evidence showing that Silva's income would have decreased.

the New Plan, but Silva was eligible for Spiffs under the Old Plan and the evidence established that Mr. Silva had never earned more than $3,000 in Spiffs in any year during the five years he was with Sysco.  Though Silva was given stock units, those united vested over the course of three years and did still do not make up for the overall decrease in compensation.

With the "New Plan," Silva was staring in the face of a $33,000 pay cut, and this under the best of circumstances if everything fell perfectly into place and he was able to earn the maximum bonus, when on a Friday afternoon he was also told he needed to sign the PCA by Monday or be terminated.  He signed the PCA.  In terms of benefit for signing the PCA, the benefits flowed only one way.  They all flowed to Sysco.  There was no consideration paid to Silva.  The consideration was he got to keep his job.  In return, Sysco got to pay Silva significantly less and insulate itself from competition should Mr. Silva demonstrate his displeasure for the pay cut by testing it on the market.  Sysco certainly did not want Silva to go out and compete and try to take the Major Client, the Crown Jewel of the Philadelphia Regional Office, which he had brought in and developed into Sysco's biggest client.  However, in trying to accomplish that goal, it offered him less money in return for his agreeing not to compete with Sysco.  While Sysco was free to change sales associates' compensation as it wished and many associates may have in fact benefited under the New Plan, that compensation change – which was in reality a dramatic pay cut for Silva – does not constitute adequate consideration to support a post-employment restrictive covenant.

In 2015, Sysco persuaded Silva to come to work for it because Silva had a relationship with the Major Client and Sysco wanted that business.  At the time, Sysco had done almost no business with the Major Client.  It turned out to be a brilliant move on Sysco's part.  It initially paid Silva $110,000 a year; Silva had wanted $160,000, and Sysco promised that it would get

him there if he produced and was patient. Silva performed his side of the bargain and, after reminding Sysco of its promise, in 2017 Sysco moved Silva from a high salary base of $110,000 to a low salary base of $20,800 a year plus an incentives program, including 1% of gross sales to the Major Client. This plan produced for Silva the significant earnings boost discussed above. With Silva's 1% bonus on gross sales to the Major Client, Silva reached the "promised land" and Sysco hit the mother lode. Except later, under the New Plan, Sysco reduced Silva's pay, while continuing to reap the rewards of his work. Astonishingly, Silva had turned the Major Client into a $6 million client for Sysco, headed towards the neighborhood of $8.5 million for fiscal year 2021.

  In March of 2020, COVID hit full force. In response, Sysco, a food distribution giant, felt the effects. However, because Mr. Silva's customer was on the grocery end of the business, rather than the restaurant end, he was having a banner year and had already made $75,000 and was on track to possibly make $300,000. Understandably, Sysco wanted to stabilize incomes for its nationwide sales force. In April, May and June, Sysco put all its salesmen in the same boat and stripped away the incentive-based pay in return for a much higher base salary. The record does not address whether a majority of the sales force benefited from this change, but certainly Mr. Silva did not benefit. His annualized pay during those three months with commission was $175,000, which is significantly lower than the sum he was on track to make and had made previously. Notably, his bonus of 1% of the gross sales to the Major Client was stripped from him, never to return. As part of the "team" responsible for managing the Major Client's account, Silva hoped this compensation change was a temporary setback for him. That was not to be, as will be seen. It can be noted here that throughout his time with Sysco, Silva was not an executive with the company, nor did he have an executive contract protecting his interests.

Indeed, when he signed the PCA, the PCA made clear Silva was still an employee at-will.  Mr. Silva's only protection was his ability to compete should his employer decide to terminate him or decide not to pay him what he thought he was worth in the marketplace.  Sysco maneuvered to take even that protection from him.

Sysco nicely segued out of this three-month crisis-response plan and used it to trot out the "New Plan," effective July of 2020.  The "New Plan" institutionalized a permanent, nationwide plan that grouped all Sysco sales employees into four groups, with Silva in the highest compensation group.  Even in this highest group, Silva's compensation maxed out at $207,000 a year, plus the ability to earn Spiffs and some other benefits.  However, based on Silva's past track record, his income from Spiffs would have been no more than $3,000 a year.  Sysco indicates there were other incentives, such as $300 monthly transportation allowance,[4] a stock unit benefit of $17,000 vesting one third over the course of three years, and a company-paid cell phone.  Sysco trying to spin this package as a "benefit" for someone who had made $240,000 in 2019 and was on track to make $300,000 in 2020 strains credulity.

No doubt the plan was tailored to be a one size fits all compensation scheme nationwide. There were bound to be outliers, which Sysco's corporate management recognized.  Sysco management distributed to managers talking points on how to answer the concerns of individuals whose compensation would decrease.  Sysco's New Plan made few allowances for individual cases, but did provide for regional managers to provide a sales associate hit hard by this plan a differential that would close the gap between what that associate had made under the Old Plan and what he or she would make under the New Plan.  For some reason, Sysco overplayed its

---

[4] However, Sysco's citing that incentive to suggest it was a benefit to Silva borders on the cynical, as the record shows Silva previously had a $750 car allowance that was terminated in April.  Tr. at 158:17-159:5.

hand with Silva and did not make him this offer. Sysco stated that Silva did not complain about his decreased compensation under the New Plan, but anyone could guess he would be unhappy with a substantial pay cut.

Instead, as to Silva, Sysco decided it would try to have its cake and eat it to. Sysco essentially told Silva that not only was it going to cut his pay and cap his bonus, it was going to block him from what every self-respecting, high-producing salesman would do given this treatment by an employer – take his talents and clients elsewhere. It can be noted here that the market has been very, very good for Sysco stockholders and executives holding stock options during the COVID pandemic. The stock offered to Silva was trading at $50 a share and now is trading at $75 a share. Sysco did not want competition from its sales force as a consequence of instituting this New Plan, especially from Silva, who had brought in the Crown Jewel of customers to the Philadelphia regional office. Rather than working something out with Silva and offering a contract that provided him with protections and clear benefits, it kept him at-will, all while claiming that the New Plan provided higher "guaranteed" income to Silva. Sysco expressly told Silva that he could not negotiate the terms of the PCA and never gave him the opportunity to negotiate his compensation under the New Plan.

Consideration does not simply mean "change," it requires an actual benefit to the employee. While Sysco was apparently free to alter its compensation scheme for its sales associates, to claim that change, which resulted in a significant net-pay decrease for the Defendant, constituted consideration for a covenant not to compete is specious. To the extent Plaintiff argues that the benefit to the Defendant was the new "stability" in his pay, that benefit is illusory because he remained an at-will employee. Silva's track record of hard work and sales success show his incentivized benefits were better compensation for him, and not the

disincentivized guarantee of a lower income.  Silva was never given the option to keep his Old Plan compensation and not sign the PCA; he was told the New Plan was going to be his compensation and he could sign the PCA or be terminated.  An employee would be hard-pressed to understand how he or she was receiving a benefit in that scenario.  Sysco unilaterally changed the rules on Silva to benefit Sysco and pulled the high earnings formula rug out from under Silva. That was not cricket and certainly not consideration.

    Sysco argues that Silva is twisting the narrative to claim that he was the wronged party in this litigation.  Sysco notes that Silva made more money when he came to Sysco from his previous employer and that Silva was handsomely rewarded for growing Sysco's business with the Major Client.  Sysco also claims that it has a protectable business interest in its relationship with the Major Client and that Silva does not somehow own that relationship.  While this may all be true, it does not undermine the simple conclusion that Silva was not provided with consideration sufficient to support the PCA Sysco required him to sign.  Covenants not to compete are disfavored under Pennsylvania law and, while a net pay increase may not necessarily be required to have a protective covenant be enforceable, the burden is on the employer to show some kind of benefit to the employee.  Sysco also argues that Silva's projections for his 2020 income should be disregarded as speculative; however, this mischaracterizes the analysis.  First, Silva's 2019 income of $239,516.67 is not speculative.  His income of over $75,000 for the first three months of 2020 is not speculative.  Sysco's gross sales of approximately $6 million per year to the Major Client is not speculative, and nor is it speculative that Sysco's gross sales to the Major Client were $5 million for the first seven months of Sysco's 2021 fiscal year.  Having said that, the burden is not on Silva to prove that his

pay was cut, the burden is on Sysco to show a reasonable probability that the PCA was supported by adequate consideration.

The problem for Sysco is it did not tailor the New Plan to Silva's previous compensation and expectations. One would think that corporate, in-house counsel would have known and advised that, because the PCA was entered into post-employment, it would not be enforceable without a benefit to the employee. The PCA on its face states that the benefit to the employee (the only consideration actually mentioned in the PCA) is "being placed into a position of trust and confidence," however there is no evidence in the record that Silva's position at Sysco vis-à-vis any confidential information actually changed. So why continue with the instant suit. Sysco was able to quickly secure the drive onto which Silva copied a proprietary file as a result of this Court's order. Sysco has been able to retain the Major Client's business without competition from Silva while Silva has been restrained from competing under this Court's order and the parties' stipulation. This arrangement has essentially has given Sysco three months free rein over the Major Client's business; that free rein as of now ends.

An appropriate order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**